IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| TYREE STRATTON | : | No. 05-68-2 |
| | : | |

**Goldberg, J.**                                                                                      **January 5, 2021**

## MEMORANDUM OPINION

Defendant Tyree Stratton, a 41-year-old inmate housed at Federal Correctional Institution Fort Dix, requests compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c). The parties dispute whether Stratton exhausted his remedies prior to seeking court intervention. Upon review of Stratton's request to the warden where he is incarcerated, and recognizing that he is proceeding *pro se*, I conclude that exhaustion has occurred. But consideration of the factors enumerated in 18 U.S.C. §§ 3553(a) and 3582(c) necessitates that I deny Stratton's release request.

**I.   BACKGROUND PROCEDURAL HISTORY**

   A.   Defendant's Criminal Conduct and Conviction

On December 1, 2005, a jury found Stratton guilty of conspiracy to commit armed bank robbery, armed bank robbery, and using and carrying a firearm in connection with a crime of violence, in violation of 18 U.S.C. §§ 371, 2113(d), and 924(c). The Government makes the following representations regarding the offense conduct, which Stratton does not contest:

> a. Stratton was one of three masked gunmen who staged a "takeover" armed robbery of the Wachovia Bank branch in the Roosevelt Mall in Philadelphia, in the early afternoon of November 12, 2004. At least two of the robbers were armed with handguns. The robbers fled the bank with approximately $2,763 in cash, escaping in a sky-blue Chevrolet minivan, which they wrecked at the conclusion of a high-speed flight from the police. . . .

    b. Stratton and his cohorts threatened, manhandled, and injured a number of people during the armed robbery and its aftermath. . . . The defendants wore ski masks, matching gloves, and dark clothing to hide their identities.  At the start of the robbery, the defendants pushed a female bank customer, who had been outside using the ATM machine, into the bank at gunpoint.  One female bank employee was pistol-whipped in the head; another was hit on the arm with a gun and dragged by the front of her shirt across the floor.  The pistol-whipped employee was treated at the hospital for lumps on her head.

    c. The defendants herded seven tellers into a small office to force them to turn over the key to the bank's vault.  As the defendants yelled at the tellers to go into the office, one defendant pushed a teller who was six months pregnant, with great force, shoving her into another teller.  After the defendants had herded all the tellers into the office, one defendant kept screaming and cursing at the tellers, demanding the vault key. . . . [O]ne defendant fired a round into the office floor, so close to the feet of the tellers that one woman was hit in the head by bullet fragments, which cut her scalp.  The defendants left the bank with money from the teller drawers only after the terrified tellers persisted in telling them that the bank manager who had the vault key was at lunch. . . .

    d. The defendants then led the police on a high-speed chase, during which their van ran several red lights.  The chase ended when the defendants attempted to run another red light . . . [and] hit a car coming through [an] intersection, causing a serious four-car accident.  At least four other persons in the other three cars were injured in the crash; four persons were taken to the hospital.

    e. After the accident, the three defendants got out of the van in an attempt to flee on foot.  One of the co-defendants, Anthony Archer, left the van with a semi-automatic handgun in his hand, which he pointed in the officers' direction.  In response, one of the officers fired his service weapon, striking Archer in the back.  The firearm that Archer had been holding fell to the pavement.  It was loaded with 13 rounds of ammunition. . . .

    f. Meanwhile, Stratton and the third co-defendant, Davis, ran from the wrecked getaway van in an attempt to elude the police.  Stratton and Davis ran from the intersection into an alley, where they shed the gloves they had worn during the robbery.  Stratton and Davis jumped a fence and ran together into an adjacent yard, where they turned toward the two police officers who were chasing them on foot.  One officer, believing that Stratton was reaching for a weapon at his waistband, fired his service revolver but did not hit either man.  That same officer captured Davis . . . Stratton was found minutes later, hiding in a shed . . .

(Gov't Opp. at 1–4, ECF No. 206 (citations omitted).)

On April 11, 2006, Stratton was sentenced to 260 months of imprisonment by the Honorable Stewart Dalzell.  On October 7, 2016, the case was transferred to my docket.  On appeal, the United States Court of Appeals for the Third Circuit affirmed.  United States v. Archer, et al., 282 F. App'x 164 (3d Cir. 2008).  Stratton is serving his sentence at FCI Fort Dix with an anticipated release date of May 27, 2023.

      B.      Defendant's Requests for Compassionate Release

On July 31, 2020, Stratton submitted a written request to the warden of FCI Fort Dix seeking "to be evaluated and released pursuant to CARES Act due to the COVID-19 pandemic."[1] (Def.'s Mot., Ex. A, ECF No. 205.)  On August 3, 2020, the warden denied his request.  (Id.; Govt Opp. at 5.)  On September 14, 2020 and November 13, 2020, Stratton submitted requests for relief to this Court.  The Government filed a response in opposition on November 9, 2020.

## II.    LEGAL STANDARD

Once a defendant exhausts his administrative remedies, the First Step Act permits the sentencing court to reduce a term of imprisonment based upon:  (1) consideration of the factors set forth in 18 U.S.C. § 3553(a); (2) a finding that "extraordinary and compelling reasons warrant such a reduction"; (3) a determination that the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).[2]  The applicable policy statement is the United States Sentencing Guidelines, which includes an Application Note that defines extraordinary and compelling reasons that may justify compassionate release:

> **1. Extraordinary and Compelling Reasons.**–Provided the defendant meets the requirements of subdivision (2) [not a danger to the safety of any other person or to

---

[1]     The "CARES Act" refers to the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136, § 12003.

[2]     The defendant has the burden to show that he is entitled to a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1).  United States v. Haynes, No. 17-0042, 2020 WL 3895767, at *2 (D.V.I. July 7, 2020) (citing United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016) and United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992)).

the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

> **(A) Medical Condition of the Defendant.**–
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, Application Note 1.

### III. ANALYSIS

#### A. Exhaustion of Administrative Remedies

The parties dispute whether Stratton has exhausted his administrative remedies in accordance with 18 U.S.C. § 3582(c)(1)(A). In support of exhaustion, Stratton submits his written request to the warden at FCI Fort Dix, in which Stratton asked "to be evaluated and released pursuant to CARES Act due to the COVID-19 pandemic." (Def.'s Mot., Ex. A, ECF No. 205.) In opposition, the Government maintains that because Stratton's request failed to mention compassionate release and referenced only the CARES Act, he failed to trigger or exhaust the requisite remedies mandated in 18 U.S.C. § 3582(c)(1)(A). The Government maintains that the

CARES Act is solely within the discretion of the Bureau of Prisons ("BOP") and allows the BOP to transfer inmates to home confinement toward the end of a sentence.

The First Step Act permits courts to reduce a term of imprisonment upon a defendant's motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). The United States Court of Appeals for the Third Circuit recently determined that this thirty-day requirement is mandatory and that a defendant's failure to exhaust his administrative remedies "presents a glaring roadblock foreclosing compassionate release[.]" United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020). The Third Circuit also clarified that administrative remedies are exhausted thirty days after the warden receives a petitioner's request for compassionate release. United States v. Harris, 812 F. App'x 106, 107 (3d Cir. 2020).

In support of its position that exhaustion has not occurred, the Government cites to United States v. Powell, No. 15-496-4, 2020 WL 2848190 (E.D. Pa. June 2, 2020). In Powell, a judge within this district found, in a footnote, that there was no evidence of exhaustion because the defendant's written request to the warden "did not mention the First Step Act, compassionate release, or a request for modification of his prison term." Id. at *2 n.5. Thus, the court declined "to construe [the defendant]'s request for home confinement—relief governed by a different statute—as a request for compassionate release." Id.

More recently, another judge, also in this district, reached the opposite conclusion in United States v. Hight, No. 04-333-1, 2020 WL 5653487 (E.D. Pa. Sept. 23, 2020). Distinguishing Powell and reviewing the language and jurisprudence surrounding compassionate release and the CARES

5

Act, the Hight court stated: "if a defendant requests that the warden grant him a transfer to home confinement under the CARES Act, the warden denies the request, and thirty days have elapsed since presenting the request to the warden, the Court finds that the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A) is satisfied." Hight, 2020 WL 5653487 at *5. The judge in Hight reasoned that it was "especially wary of imposing an overly-restrictive interpretation of the exhaustion requirement on defendants acting pro se . . ." and proceeded to analyze whether extraordinary and compelling reasons warranted release. Id.

I find Hight to be persuasive. Acting *pro se*, Stratton submitted a written request to the warden at FCI Fort Dix for evaluation and/or release and cited the CARES Act. While Stratton cited the wrong statute, he explicitly referenced the COVID-19 pandemic and requested release. Like the judge in Hight, I am reluctant to hold this *pro se* Defendant to such an exacting standard when it is clear he was seeking relief under 18 U.S.C. § 3582(c)(1)(A). I thus conclude that Stratton's written request and the warden's subsequent denial, both of which Stratton submitted in support of his motions, satisfy the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A). Therefore, I will next consider whether Stratton has presented extraordinary and compelling reasons justifying his release.

B.  Extraordinary and Compelling Reasons

In an effort to prove extraordinary and compelling reasons for release, Stratton cites to the COVID-19 pandemic and his good conduct while incarcerated, and indicates that he has atoned for his crimes and is committed to a law-abiding life upon release. The Government points to Stratton's medical records, which reveal that he is 41 years old, is generally in good health, and does not present with any condition identified by the Center for Disease Control and Prevention as a severe risk factor should he contract COVID-19.

6

Much has been written about the devastating impact that the COVID-19 pandemic has had on prison populations, which need not be repeated here.  However, existence of the COVID-19 pandemic alone does not provide a basis for a sentence reduction.  See Raia, 954 F.3d at 597.  Stratton's generalized concerns about the pandemic do not constitute a "compelling reason" for release.  United States v. Roeder, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

Moreover, consideration of several § 3553(a) factors weigh against his requested relief.  Stratton's crimes were alarmingly dangerous and caused numerous injuries.  The nature and circumstances of his actions and the seriousness of his offense certainly outweigh all other § 3553(a) factors.  A reduction of his sentence would not promote respect for the law or adequate deterrence.  18 U.S.C. § 3553(a)(1)–(2).

An appropriate order follows.